**In re COLEMAN ENTERPRISES, INC., and American Cyber Corporation, Inc., Debtors.**

Nos. 00–33476, 00–33477.

United States Bankruptcy Court, D. Minnesota, Third Division.

Sept. 5, 2001.

Robert T. Kugler, Robins, Kaplan Miller & Ciresi, Minneapolis, MN, Robert P. Goe, Goe & Forsythe, L.L.P., Newport Beach, CA, for QAI, Inc.

Kenneth Corey-Edstrom, Henningson & Snoxell, Ltd., Brooklyn Center, MN, for debtors.

Michael R. Fadlovich, Minneapolis, MN, for United States Trustee.

Margaret M. Newell, Washington, DC, Roylene A. Champeaux, Minneapolis, MN, for United States, through the Federal Communications Commission.

ORDER RE: MOTION OF QAI, INC. FOR ABROGATION OF DEBTORS' ELECTION UNDER 11 U.S.C. § 1121(e), DEBTORS' MOTION FOR DISMISSAL, AND MOTION OF U.S. TRUSTEE FOR CONVERSION

GREGORY F. KISHEL, Chief Judge.

These jointly-administered Chapter 11 cases came on before the Court on July 17, 2001, for hearing on several motions: that of QAI, Inc. ("QAI"), a creditor, for an order abrogating the Debtors' election to be treated as small businesses under 11 U.S.C. § 1121(e); the Debtors' motion for dismissal of the cases; and the motion of the United States Trustee for conversion of the cases. QAI appeared by its attorneys, Robert T. Kugler and Robert P. Goe. The Debtors[1] appeared by their attorney, Kenneth Corey-Edstrom. The United States Trustee appeared by her attorney, Michael R. Fadlovich. The United States of America, through the Federal Communications Commission ("FCC"), appeared by its attorneys, Margaret M. Newell and Roylene A. Champeaux. Upon the moving and responsive documents for all of the motions, the arguments of counsel, and all of the other files, records, and proceedings in these cases, the Court makes the following order.

## PRE–PETITION HISTORY: NATURE OF DEBTORS' BUSINESS AND RELATIONSHIPS AMONG PARTIES AT BAR

These Chapter 11 cases arise out of the telecommunications industry in the post-deregulation years of the late 1990s; the Debtors, QAI, and Pathfinder Capital, Inc., ("Pathfinder"), the Debtors' other major unsecured creditor, all did business in that industry in various roles. Gleaned from the various documents in this case,[2] the nature of the Debtors' pre-petition relationships with QAI and Pathfinder is as follows:

The Debtors are both artificial business entities, Coleman having been incorporated in Minnesota and American Cyber in Nevada. They are telecommunications companies, providing long-distance telephone service to residential and business

---

1. When individual references are necessary, the Debtors will be identified as "Coleman" and "American Cyber."

2. In the main, the description of the structural relationships is taken from the several disclosure statements on file. Of course, these documents are not evidence as such; the ve-racity of their fact averments has not been put before the Court as yet. However, at this point there is no open dispute as to the accuracy of their recitations. Thus, their content on the relationships is assumed to be true, to afford backdrop to the substantive discussion in this order.

customers under the trade name "Local Long Distance." Before their respective bankruptcy filings, the Debtors afforded service over wide geographic areas, Coleman in 28 states and American Cyber in 45.

As telecommunications companies, the Debtors are subject to various federal and state regulatory structures. Under the federal rules, only telecommunications companies can obtain new customers for long-distance telephone service. Under the current legal regime, however, telecommunications companies need not themselves provide the utility service directly or through subsidiaries; they may subcontract with independent entities, or even strings of them, to actually meet customers' needs. In order to provide service in a particular state, however, a telecommunications company must register itself with an agency of the state and must obtain a Certificate of Public Convenience and Necessity. After that, the telecommunications company must see that its own activities meet the state and federal regulatory requirements. As to the same requirements, it is responsible for the activities of certain of its contractors and subcontractors.

The Debtors split out various operational functions of their business to subcontractors—the solicitation of new customers to one or more marketers, and the provision of actual long-distance service on a wholesale basis to QAI, Pathfinder, and RSL Com USA, Inc. ("RSL"). The relationship between the Debtors and these wholesalers was set forth in documents entitled "Independent Marketing Agreements" ("IMAs"). The wholesalers, in turn, subcontracted with an actual provider of service—in the Debtors' case, usually Sprint Communications, L.P. Through their own employees, the wholesalers did customer billing and performed direct

"customer service"—responding to inquiries and complaints—for the Debtors.

Once the Debtors obtained and placed customers with a wholesaler, they were to receive a lump-sum payment from the wholesaler as an advance against future revenues from the customer's account. When a customer's account started generating ongoing revenue, subcontractors were to be paid and the wholesalers were to receive a fee for their direct services and for coordinating all contractors' performance. The Debtors were then to receive the net revenues, in periodic payments from the wholesalers.

The Debtors commenced operation under these arrangements in 1997–98. In 1999, however, QAI and Pathfinder stopped accepting new customers from the Debtors and ceased payment to them out of ongoing customer accounts. They alleged that the initial advances to the Debtors had accumulated to an excessive amount and had to be reduced by offset. In April, 2000, RSL took the same action. These events deprived the Debtors of all ongoing revenue, and led to their Chapter 11 filings several months later.

Before the bankruptcy filings, the FCC and various state regulatory agencies had received complaints that the Debtors' marketing subcontractors had engaged in "slamming" (unauthorized transfer of customers from other long-distance service providers to the Debtors) and "cramming" (provision of particular billed services to customers that they had not sought or authorized). On the basis of the complaints, they commenced investigations or enforcement proceedings against the Debtors. Several of the state-agency matters are still pending. The proceeding by the FCC resulted in the levy of an administrative fine against the Debtors on December 7, 2000, in the amount of $750,000.00. The

Debtors' right to seek further review of this fine has now lapsed.

## PROCEDURAL HISTORY

1. On August 18, 2001, the Debtors filed separate voluntary petitions for relief under Chapter 11. On the first page of both petitions, the Debtors checked the boxes that attested "Debtor is a small business as defined in 11 U.S.C. § 101," and "Debtor is and elects to be considered a small business under 11 U.S.C. § 1121(e)."

2 Each Debtor included entries for QAI and Pathfinder on its respective Schedule F, that for unsecured claims. Both creditors' claims were assigned a value of "1.00," and were alleged to be contingent, unliquidated, and disputed. The consideration for QAI's claim was stated as "subcontractor of long-distance provider."

3. On August 30, 2000, the Debtors filed separate complaints in adversary proceedings against QAI and Pathfinder. In them, they alleged that QAI and Pathfinder had breached the IMAs by failing to provide accountings of their receipt of revenues and other performance under the IMAs, and by failing to make payment to the Debtors since October 1, 1999. Styling the complaints under the turnover provisions of 11 U.S.C. § 542, the Debtors sought judgments directing QAI and Pathfinder to comply with their duties of accounting and payment for all post-petition revenues. The Court granted the Debtors' motion for a preliminary injunction and denied a motion by QAI and Pathfinder for a stay pending appeal. On December 21, 2000, the United States District Court (Montgomery, J.) denied those defendants' motion for leave to appeal, and their renewed motion for a stay pending appeal.

4. On September 15, 2000, the Court heard the Debtors' motions for joint administration of these cases. As grounds for the relief, the Debtors alleged that the same person, Daniel G. Coleman, owned 100 percent of the shares of stock in both corporations; that the Debtors were engaged in similar businesses and had the same major creditors; and that they anticipated no major conflicts of interest between them in the administration of their respective estates. On September 18, 2000, the Court entered an order granting the motion.

5. Immediately before their Chapter 11 filings, the Debtors had commenced a lawsuit against QAI, Pathfinder, and one Dave Wiegand in the Minnesota State District Court for the Tenth Judicial District, Washington County. Their pleaded causes of action were for breach of contract and fraud. Pursuant to a stipulation among the parties, this Court granted relief from the automatic stay to the defendants in this suit, to allow them to interpose answers and to maintain all claims and defenses. The litigation has proceeded, though its present status is not entirely clear from the record here.[3]

6. On November 27, 2000, the Debtors filed a motion for court approval of their rejection of their IMAs with QAI and Pathfinder, as executory contracts within the scope of 11 U.S.C. § 365. In seeking this relief, the Debtors alleged that Sprint Communications had discontinued long distance service to some of their customers, and threatened to discontinue service to the rest, due to the way QAI and Pathfinder had structured and executed their provision of service on a wholesale basis under

---

3. Counsel have stated that the claims in suit in the state court go only to the parties' prepetition performance under the IMAs. Issues regarding post-petition performance are to be litigated in the adversary proceedings here.

the IMAs. QAI and Pathfinder objected to the grant of such relief, at least without certain conditions on the rejection. The Court overruled the objection and granted the motion by an order entered on November 30, 2000.

7. The Debtors then moved for an order authorizing their entry into service contracts with NorthStar Communications, Inc., under which NorthStar would undertake to provide service to the Debtors' customers on a wholesale basis. The motion was noncontroversial. It was granted under an order entered on January 3, 2001.

8. On January 25, 2001, the Debtors filed a joint plan with accompanying joint disclosure statement. In close proximity, these documents were followed by a first amended plan and first amended disclosure statement (filed February 8, 2001) and a second amended plan and second amended disclosure statement (filed February 12, 2001). Via an application filed on February 16, 2001, the Debtors requested that the Court conditionally approve the disclosure statement pursuant to 11 U.S.C. § 1125(f)(1).

9. Counsel for the U.S. Trustee advised the Court that he had no objection to the adequacy of the disclosure statement. The Court then entered an order conditionally approving the disclosure statement and setting a hearing on final approval of the disclosure statement and on confirmation of the second amended plan for March 26, 2001.

10. QAI and Pathfinder timely filed an objection to the second amended disclosure statement and to the confirmation of the second amended plan. Their objections to the disclosure statement went to the adequacy of its content on several points: a loan that Coleman had given to Daniel Coleman; the justification for the post-confirmation salaries that the Debtors proposed to pay to certain insiders; the assumptions underlying the plan's cash-flow projections and liquidation analyses; and the rationale for the Debtors' proposal to wind down their business over several years by normal attrition in their customer bases, without solicitation of new business. Their major objections to the plan were that it improperly designated and artificially impaired an "administrative convenience" class of small unsecured creditors to frame one class that might accept the plan; that it was not feasible; and that it violated the "absolute priority rule" of 11 U.S.C. § 1129(b) because it would allow Daniel Coleman to retain his equity interest in the face of their expressed intention to reject the plan.

11. The FCC also filed objections to the disclosure statement and to confirmation. Its objections to the disclosure statement incorporated several of those made by QAI and Pathfinder and added others: that the disclosure statement lacked adequate information on the status of the Debtors' causes of action in litigation against RSL, on the existence of other claims by governmental units, and on the valuation methods for the liquidation analysis. Its objections to the plan reprised several of those made by QAI and Pathfinder, and added one: that the plan unfairly discriminated against the FCC's claim because it appeared to contemplate some sort of court procedure beyond the customary process of allowance before the FCC would be entitled to payment.

12. At the hearing on March 26, 2001, counsel advised that the Debtors were attempting to resolve the objections, and requested a continuance. The Court granted their request, directing that a status conference be held about one week before a reconvened hearing.

13. After that status conference was held, the Debtors filed a fourth proposed plan. This one was denominated "Modified Plan."

14. After an additional continuance to allow the parties to explore further options in settlement, counsel advised the Court that their clients' strategies had changed; the Debtors now wished to withdraw their plans and to seek dismissal of the cases, and QAI wished to file its own plan for submission to creditors and the Court. The result was the motions at bar, filed pursuant to a scheduling order entered under 11 U.S.C. § 105(d).

15. On December 18, 2000, QAI filed a proof of claim, captioning it in Coleman's case only. It was assigned No. 12 on the clerk's register. In it, QAI asserted an unsecured claim based on "notes receivable" in the amount of $2,629,000.00. On May 7, 2001, QAI filed an amended proof of claim, assigned No. 20, which increased the facial amount of this claim to $3,406,252.42.

16. QAI filed a separate proof of claim on December 8, 2000, which was assigned No. 13. In it, it asserted a claim in an unliquidated and unknown amount, for "Damages from rejection of contracts."

17. On December 18, 2000, Pathfinder filed a proof of claim, captioning it in Coleman's case only. It was assigned No. 14 on the clerk's register. In it, Pathfinder asserted an unsecured claim based on "notes receivable" in the amount of $321,000.00. On May 7, 2001, Pathfinder filed an amended proof of claim, assigned No. 21, which increased the facial amount of this claim to $1,664,545.04.

18. On February 13, 2001, the FCC filed a proof of claim, which was assigned No. 17 on the clerk's register. In it, the FCC asserted a general unsecured claim in the amount of $750,000.00, on the basis of the administrative fine.

19. Neither the Debtor, nor any other party in interest, has objected to any of these claims.

### MOTIONS AT BAR

In the wake of the Debtors' withdrawal of their plan, the parties proffer several alternatives to wind up these cases:

1. Via its motion, QAI seeks a determination that the Debtors never qualified to have their cases treated under the so-called "small business track" of Chapter 11, and in any event have failed to reorganize in the way that the statute contemplates. It requests an order that would terminate that status and treatment, but leave the Debtors in Chapter 11. The grant of such relief would allow QAI to seek confirmation of its creditor's plan of reorganization.[4]

2. Via their motion, the Debtors seek to exit Chapter 11 via dismissal. The Debtors tacitly acknowledge that they cannot obtain confirmation of their plan over a rejection by QAI and Pathfinder; those creditors' allowed claims would permit them to control a vote by the class of unsecured creditors, and the Debtors lack the means to challenge the claims in time for a ruling to affect the confirmation process. Thus, they admit, reorganization through the bankruptcy process is not an option for them. In their estimation, their dispute with QAI and Pathfinder is now most appropriately resolved in the state-court litigation. The Debtors have offered to

---

4. In the scheduling order, the Court allowed QAI to file a plan and disclosure statement, which were to be held in abeyance pending the outcome of the motions at bar. They are now on file.

condition a dismissal on the payment in full of the claims of all unsecured creditors other than QAI and Pathfinder, in two post-dismissal installments. Their duty to do so would be set forth in the order of dismissal. These payments would be funded in large part from the proceeds of a loan from a newly-formed entity called Twin Cities Capital, LLC, headed by NorthStar's president. To secure the loan, the lender would receive a first-priority lien against the Debtors' assets. The FCC sides with the Debtors on this proposed outcome, though it suggests that dismissal be deferred until the Debtors have made the first payment to unsecured creditors.

3. The U.S. Trustee initially moved for conversion of these cases, on the ground that the Debtors' failure to obtain confirmation of a plan under the temporal strictures of the small business track had worked an unreasonable delay prejudicial to creditors. At the hearing, her counsel strongly opposed the "conditional" dismissal proffered by the Debtor. The U.S. Trustee favors conversion to Chapter 7, to allow a panel trustee to liquidate the businesses. If the cases are to remain in Chapter 11 but off the small business track, she urges that any creditor's plan include a bidding mechanism.

## DISCUSSION

## I. SMALL BUSINESS FAST TRACK IN CHAPTER 11: STATUTORY BASIS

In the Bankruptcy Reform Act of 1994, Pub.L. No. 103–394, Congress amended several provisions of Chapter 11 to create a variant of the process to obtain confirmation of a plan of reorganization. These changes were collected in Section 217 of the Act; they were to apply to cases where the debtor is a "small business," as defined. Very little legislative history accompanied the enactment. Congress did announce, however, that the amendments were passed "to expedite the process by which small businesses may reorganize under chapter 11." *Floor Statements on the Bankruptcy Reform Act of 1994,* 140 CONG. REC. H 10,764, H 10,768 (Daily ed. October 4, 1994) (analysis of Act's provisions appended to remarks of Rep. Brooks).

As the means, Congress modestly retooled several sections that govern the court procedures for reorganization, to give small business debtors the option of a more truncated confirmation process. On motion and upon a showing of cause, "the court may order that a committee of creditors not be appointed." 11 U.S.C. § 1102(a)(3). If a debtor elects to be treated as a small business, it has the exclusive right to file a plan for the first 100 days of the case, 11 U.S.C. § 1121(e)(1) [5], and "all plans shall be filed within 160 days" of the order for relief in bankruptcy, 11 U.S.C. § 1121(e)(2).[6] These deadlines are subject to limited modification, on motion made before the deadlines have passed. 11 U.S.C. § 1121(e)(3). Finally, there is a foreshortened procedure for the process of disclosure and solicitation. For a small business debtor, the court may "conditionally approve a disclosure statement subject to final approval after notice and a hearing,"

5. This contrasts with the 120–day exclusivity period generally applicable under 11 U.S.C. § 1121(c)(2).

6. Chapter 11 contains no general deadline for the filing of all plans in a case.

11 U.S.C. § 1125(f)(1). The conditionally-approved disclosure statement may be used to solicit creditor votes on the debtor's plan. 11 U.S.C. § 1125(f)(2). Finally, the hearing on final approval of the disclosure statement is combined with the hearing on confirmation of the plan. 11 U.S.C. § 1125(f)(3).

These alternate measures are available to a Chapter 11 debtor that meets the definition of "small business" under 11 U.S.C. § 101(51C):

> ... [a]person engaged in commercial or business activities ... whose aggregate noncontingent liquidated secured and unsecured debts as of the date of the petition [in bankruptcy] do not exceed $2,000,000.

This "small business fast track" for confirmation is modeled on prior local initiatives to reduce delay and cost in uncomplicated business reorganization cases, most prominently in the Eastern District of North Carolina. Karen Gross and Patricia Redmond, *In Defense of Debtor Exclusivity: Assessing Four of the 1994 Amendments to the Bankruptcy Code*, 69 AM. BANKR. L.J. 287, 298 (1995). Since its enactment, however, the commentators have not especially favored the measure. Some

have wondered whether it would have any meaningful large-scale effect, since the expediting occurs only on the debtor's voluntary election. *Id.* at 300; David G. Hicks, *The October Surprise: The Bankruptcy Reform Act of 1994—An Analysis of Title II—The Commercial Issues*, 29 CREIGHTON L. REV. 499, 520 (1996); Brian A. Blum, *The Goals and Process of Reorganizing Small Businesses in Bankruptcy*, 4 J. SMALL & EMERG. BUS. L. 181, 212 (2000). Others have opined that it is superfluous, given the explicit extension of case-management authority in 11 U.S.C. § 105(d) that was also added by the 1994 Act. David B. Young and Jeff Bohm, *Small Business and Single Asset Real Estate Reorganization Issues*, 20TH ANN. CURR. DEV. IN BANKR. AND REORGANIZATION 1998, 767 PLI/Comm 853, 872–873 (1998). *See also* Blum, *Goals and Process*, 4 J. SMALL & EMERG. BUS. L. at 213–214. It appears that the amendments as a whole have generated only four published judicial decisions in the seven years since enactment.[7] Many judges have observed that on their dockets the election is rare in the taking.

One wonders, whether, as structured, the small business fast track was a solution without a problem.[8] Nonetheless, it is on

---

7. *In re Win Trucking, Inc.*, 236 B.R. 774 (Bankr.D.Utah 1999); *In re Western Steel & Metals, Inc.*, 200 B.R. 873 (Bankr.S.D.Cal. 1996); *In re Haskell–Dawes, Inc.*, 188 B.R. 515 (Bankr.E.D.Pa.1995); *In re Aspen Limousine Serv., Inc.*, 187 B.R. 989 (Bankr.D.Colo. 1995).

8. The remedy would fit best in the reorganization caseload of a small judicial district, one characterized by a more homogeneous and locally-based economy. Too, it would seem to work best with a bankruptcy bar limited in its numbers, and tied together by a more traditional and deferential set of professional understandings. Such circumstances would foster a self-selection process. Only debtors in the simplest of cases would use the election. They would be more forthcoming in the

content of their disclosure statements, largely because their locally-based creditors would already know all their business anyway. Finally, debtors and creditors would come to the table quickly to work their deals, without dithering about the technical requirements of 11 U.S.C. § 1125. However, in larger districts in more complex metropolitan or regional economies, and within larger, more diverse bankruptcy bars, the pre-existing relationships between parties and between counsel tend to be much more attenuated. Trust and deference are much less automatic. There is a far greater possibility of antagonism. This leads to mutual insistence on a legalistic approach to dispute resolution. The fastness of the fast track hinges entirely on the "provisional approval" of a disclosure statement passing without subsequent objection.

the books; the Debtors here elected to be "treated" under it; and its underlying considerations must structure the analysis on the motions at bar.

## II. SEQUENCE OF ANALYSIS

■ At hearing, these motions were argued in the order in which the movants had filed their papers. The great disparity in the parties' positions, however, merits considering the sequence in which the motions are addressed and decided.

The Debtors clearly believe that their motion for dismissal should be considered first. This, of course, would position them as petitioners in bankruptcy that are still in the status of small businesses. For reasons that go to the substantive merits of the motion, however, this would not be right. It could result in the Debtors enjoying many of the end benefits of a confirmed plan, judicially sanctioned, but while the case is in a legal posture in which *no* party is to be formally proposing a plan. *See § IV., infra.*

At least initially, the U.S. Trustee urged that her motion for conversion be considered and granted first. In her estimation, the case is mired in the small business track beyond rescue, with all of the active parties' motivations suspect, and the situation calls for a neutral panel trustee to unseat them from control. This pitch had more weight than the Debtors'. However, and again for reasons that go to the merits, the circumstances favor holding the U.S. Trustee's motion as a reserve measure, for use if all others fail.

QAI's motion, on the other hand, goes most to the essence of these cases—the bramble over which all of the active parties have been in sharp disagreement for months. It is the only one that addresses the current impasse in reorganization, while giving more than lip service to the preservation of value. Thus, the discussion should open with QAI's gambit, to abrogate these Debtors' status as small businesses.

## III. QAI'S MOTION TO ABROGATE DEBTORS' "SMALL BUSINESS" STATUS

As QAI's counsel acknowledges, there is no *explicit* statutory warrant for his client's motion; neither the federal nor the local rules of bankruptcy procedure make provision for it, and none of the reported decisions arise out of a request for this specific relief.[9] He urges, however, that this is an appropriate instance for the court's exercise of its generalized authority to fashion equitable relief under 11 U.S.C. § 105(a).[10]

### A. The Parties' Positions

QAI acknowledges that the Debtors filed a first version of a plan within their

---

It breaks down entirely if meritorious objections to the disclosure statement are presented at the combined final hearing. The statute has no specific provision for a second, expedited solicitation process under an amended disclosure statement; and in any event such a procedure would cause confusion to creditors. This, in turn, would detract from the certainty and legitimacy of any result. Clearly, the fast track runs on substantial deference by all constituencies, a tacit acceptance of the inevitable defects in the debtor's pre-confirmation presentation. Absent such accommodation, it will not work at all.

9. The Court in *Win Trucking* ruled on whether a small business debtor itself could "withdraw" its election under § 1121(e). 236 B.R. at 782. It did not reach the issue of whether the status could be involuntarily terminated at the request of a non-debtor party.

10. In pertinent part, this statute provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

exclusivity period, if just barely. Howeverer, it notes that they never hit the point of actually requesting the Court to confirm a plan, and the cases certainly did not go forward with the dispatch contemplated by the applicable statute and rules.[11] Now, as QAI points out, the case has passed its one-year anniversary and there is no plan at all before the Court; the ostensible purpose of the Debtors' election and status has been honored utterly in the breach.

Beyond this, QAI argues, the Debtors were not eligible for the status in the first place, because their pre-petition debt structure exceeded the maximum pre-scribed by § 101(51C). As it notes, QAI presently holds an allowed claim of at least $3,406,252.42, and Pathfinder one of $1,664,545.04. The FCC holds an allowed claim of $750,000.00. QAI insists that the case was simply too large to fit on the track, even without considering the $175,-000.00–plus of other scheduled priority and general unsecured debt, or the nearly $119,000.00 of such debt that is evidenced by filed proofs of claim.

Thus, QAI urges, the Debtors should be deprived of small-business status, but should remain in Chapter 11. This would restore these cases to the "regular" proce-dural track, enabling QAI to present its own plan for a creditors' vote and confir-mation.

The Debtors oppose the request. Their main argument is that abrogating the sta-tus now would be "inequitable," given the way they revived their business and cash flow through the NorthStar Communica-tions contract. In the Debtors' view, they should be rewarded by a dismissal of the cases on their terms, restoring them and their creditors to the full governance of nonbankruptcy law. Not coincidentally, this would leave the Debtors and their individual principal free of the threat posed by a confirmation of QAI's plan.[12]

### B. Threshold Issue: Availability of This Relief to QAI

Though the Debtors do not raise it as such, QAI's motion poses a threshold is-sue: Does the Bankruptcy Code even au-thorize the relief it seeks? Under the situation at bar, this is really two issues.

### 1. Exit from Fast Track to Regular Track in Chapter 11

█ The first issue is the more basic: whether the Code allows a case to be taken from the fast track, but left in bank-ruptcy reorganization for the application of other remedies from Chapter 11's more general provisions. The Code and the Rules do not speak to this issue at all.

---

11. Once a plan and disclosure statement un-der Chapter 11 are on file, the clerk of Bank-ruptcy Court is required to give
> ... not less than 25 days notice by mail of (1) the time fixed for filing objections and the hearing to consider approval of a dis-closure statement; and (2) the time fixed for filing objections and the hearing to con-sider confirmation of a ... Chapter 11 ... plan.

FED. R. BANKR. P.2002(b). In a Chapter 11 case under the generally-applicable proce-dure, orders for these hearings go out within a few days of the triggering events-the filing of a disclosure statement for the former, and the resolution of all disputes over the adequa-cy of the disclosure statement for the latter.

The stacking of the two notice periods usually means that the confirmation hearing is held some 60 to 90 days after the initial filing of a disclosure statement and plan. The thought behind the conditional approval mechanism is to reduce this period by half. Gross and Redmond, *In Defense of Debtor Exclusivity*, 29 AM BANKR. L.J. at 301.

12. The threat is the cancellation of Daniel Coleman's equity interest, and the issuance of stock in the reorganized Debtors to QAI and Pathfinder. The plan would treat all unse-cured claims other than QAI's and Pathfin-der's with a *pro rata* distribution from a "pot" of $500,000.00, which QAI would fund.

One of the very few judicial decisions on the fast-track provisions does, although more by way of its predicate assumptions.

The Court in *Win Trucking* had to pass on a debtor's request to "withdraw" its small business election. While concluding that a debtor had "no absolute right to withdraw an election once made," 236 B.R. at 782, it clearly envisioned that a small-business status could be terminated without an ejection from Chapter 11. The *Win Trucking* court analogized the choice of the small business fast track to other sorts of elections in bankruptcy, particularly that under 11 U.S.C. § 1111(b). It noted that caselaw under these corollary provisions allowed such procedural or substantive retracking. 236 B.R. at 780–781. It held that such a request, at least that of a debtor, must come before the deadline under § 1121(e)(2) for the filing of all plans. It also observed that there should be no portent of prejudice to other parties. It acknowledged that such a detracking would, "in most instances, result in further delay," 236 B.R. at 781–782; this certainly would suggest the free imposition of tailored judicial controls to prevent abuse. 236 B.R. at 782. Clearly, the *Win Trucking* court did not read the Code as barring the transition, though it did not allow the debtor before it to make it.[13] Other than its summary citation to corollary caselaw, however, it did not set out a rationale.

One is present in the simple set theory of middle-school mathematics. In the terms of that analysis, Chapter 11 establishes a "set" of bankruptcy cases. This larger group consists of all cases in which the chapter's reorganization remedies may be applied to eligible debtors. Through more specific provisions, it establishes two subsets of cases in which variant procedures are applied to specific classes of debtors during the pendency of the case. The small business fast track is one of these subsets.[14] As previously noted, cases in our subset proceed under a tighter timetable, and potentially with less creditor intervention, than do cases in the larger set.

However, in all other respects, the administrative, judicial and substantive framework of cases in our subset is the general regime of Chapter 11: a haven for the reorganization of ongoing business, the imposition of fiduciary duties on a debtor in possession, a protected forum for negotiation on the restructuring of debt, a joint political and legal dynamic in which the exercise of creditor franchise is key, and the stamp of legal enforceability on the result if the plan proponent is successful. Whatever their position in the small universe of set and subsets, all debtors in Chapter 11 make the same basal request for judicial relief, and enjoy a process with these attributes. A small business case, so constituted on election of the debtor, may "track" through a moderately-different procedure, but it remains subject to the substantive requirements of the larger set.

As a matter of simple logic, a self-elected small-business debtor is on the fast track, *and* in Chapter 11 generally. Removing it from the subset does not per-

---

**13.** The debtor in *Win Trucking* did not file its plan by the deadlines under §§ 1121(e)(1)-(2). In fact, it did not do so until directed by the court after the U.S. Trustee had moved for conversion or dismissal, more than four months after the deadline under § 1121(e)(2). Further, the debtor did not seek to get off the fast track until its noncompliance with the small business requirements was raised, at a separate hearing on the adequacy of its disclosure statement. 236 B.R. at 777.

**14.** Railroad reorganization under Subchapter IV of Chapter 11, 11 U.S.C. §§ 1161 *et seq.*, is the other. We need not be concerned with its minutiae here.

force remove it from the larger set.[15]

It is clear from the structure of the statute, then, that a case may be taken off the small business fast track and left in Chapter 11.

### 2. Standing to Compel the Exit

█ The second issue is narrower: whether a creditor has standing to obtain such relief, where the debtor does not want it. Because the various provisions that govern the small business fast track were not complemented with specific remedies, this is a job for § 105(a) if such standing and such a remedy are to be recognized at all.

█ Of course, an "all writs act" like § 105(a) is not a source of substantive law. *In re NWFX, Inc.*, 864 F.2d 593, 594 (8th Cir.1989). The Bankruptcy Court should use § 105(a) only within the bounds of the substantive provisions of Bankruptcy Code, and only in a fashion consistent with their principles. *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 108 S.Ct. 963, 99 L.Ed.2d 169 (1988); *In re Easton*, 882 F.2d 312, 314 (8th Cir.1989); *In re NWFX, Inc.*, 864 F.2d at 595; *Johnson v. First Nat'l Bank of Montevideo*, 719 F.2d 270, 273 (8th Cir.1983). However, § 105 puts no facial restriction on the *structure* of relief that the courts can fashion under it, as long as they are furthering a principle identifiable in the applicable substantive law of bankruptcy. Section 105 was enacted to promote such enforcement, through means that are tailored the innumerable scenarios of financial distress in bankruptcy cases. *In re Easton*, 882 F.2d at 315; *In re NWFX, Inc.*, 864 F.2d at 595.

Chapter 11 has corollary provisions that allow changes in the form of bankruptcy through which a debtor would go, or in the administrative mechanisms that will control it. These provisions empower creditors to request such changes. For example, 11 U.S.C. § 1104(a) gives any party in interest the right to move for the appointment of a trustee to operate a debtor's business. 11 U.S.C. §§ 1112(b) and 1112(d) grant a similar right to move for the conversion of a Chapter 11 case, to one under Chapters 7, 12, or 13. 11 U.S.C. § 1121(b) allows any party in interest to file a plan of reorganization in a case on the general track of Chapter 11.

At bar, we have a situation similar to the ones that support the grant of relief under such statutes. The Debtors are alleged to have worn out their statutory welcome on the fast track, or to have lacked the eligibility to take it in the first place. The automatic stay in bankruptcy has held off their creditors for over a year,[16] but these cases are now at loggerheads, insofar as

---

**15.** Support for this viewpoint is found in the general history of American bankruptcy law, as well. The Bankruptcy Act of 1898 had three different forms of business reorganization, under Chapters X, XI, and XII, as well as bankruptcy liquidation under Chapter VII and debt adjustment for wage earners under Chapter XIII. When it structured the Bankruptcy Code of 1978, Congress continued this segregation of fundamentally different forms of bankruptcy relief—liquidation versus repayment of restructured debt. Thus, the Code still has separate complexes of interlocking remedies grouped into Chapters 7, 9, 11, and 13. However, it rejected the Act's separation of different forms of business reorganization in favor of the "one procedure-fits-all" of current Chapter 11. Though it created another form of reorganization for "family farmers" with the enactment of Chapter 12 in 1986, Congress expressly declined to enact a proposal for a separate chapter for the reorganization of small businesses when it was considering the issues that led into the 1994 Act. Blum, *Goals and Process*, 4 J. Sm. & Emerg. Bus. L. at 208–211; *In re Win Trucking*, 236 B.R. at 779 n. 7.

**16.** The Debtors note, and credibly so, that the respite has been to the benefit of their creditors—or at least most of them.

reorganization is concerned. At this point, no one can file a plan—at least as long as the cases remain subject to § 1121(e). QAI claims it will be prejudiced by further delay of any length, in any forum, from the possibility that the Debtors' customer bases will erode more quickly. Given the nature of the business, this concern cannot be rejected out of hand. QAI also argues, and credibly, that the Debtors' proposal for dismissal poses too many uncertainties—both as to the enforceability of its subsidiary covenants and as to the forum for such enforcement.

Like any other creditor interested in these cases, QAI has an identifiable stake in their specific status in bankruptcy, and in the identity of remedies available to creditors through that status; such matters directly affect the recovery and the result it would have from these cases. This tangible, personal, pecuniary interest in the outcome of a legal issue or proceeding is the classic prerequisite to standing under federal jurisprudence. *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

Recognizing a creditor's standing to move for the relief sought here, does no more than round out Chapter 11's general statutory framework for cases on the small business track. Where an ineligible debtor is on the fast track, creditors should not be procedurally hamstrung by statutory protections that have no basis. Where a dilatory, miscreant, or simply helpless debtor is beyond the bright line of § 1121(e)(2) without a plan on file, the fast

track's statutory harbor no longer serves its underlying purpose. In either case, creditors' pecuniary stakes in the case should allow them to seek the removal of a debtor from a nominal status that neither fits nor functions.

According such relief, then, is fully within the empowerment of § 105(a); it would ensure that the benefits of the fast track are limited to those for whom Congress intended them. QAI has standing to make the motion at bar, and this remedy is available to it.

### C. Merits of QAI's Motion

The final issue is whether the relief of detracking is merited.[17]

■ There is a simple way to get to the urged result: the uncontested circumstance that these Debtors were not eligible for the fast-track treatment in the first place. The Debtors' eligibility hinged on debt structures with "aggregate noncontingent liquidated secured and unsecured debts" of less than a stated amount. When the Bankruptcy Code defines eligibility via this language, disputed debts that otherwise matched the statutory characteristics must be included in the calculation. *In re Barcal*, 213 B.R. 1008, 1012 (8th Cir. BAP 1997); *In re Sitarz*, 150 B.R. 710, 725–726 (Bankr.D.Minn.1993) (both applying nearly-identical language of 11 U.S.C. § 109(e) in eligibility determination under Chapter 13, and collecting cases with same holding).

■ QAI and Pathfinder appear to have liquidated the amounts of their claims via calculations under the mechanisms in the IMAs.[18] They evidenced the claims, in

---

17. The Debtors seem to have conceded QAI's case on this point, favoring a pitch for an "equitable" override. Nonetheless, it is appropriate to analyze QAI's theory, given the lack of caselaw.

18. A debt that is "readily calculable" or "readily determinable" as to amount, according to undisputed and objective formulas or processes, is a liquidated debt. *In re Barcal*, 213 B.R. at 1013–1014.

these amounts, by filing proofs of claim. The recitations on the proofs of claim are *prima facie* evidence of the validity *and amount* of the claims. FED. R. BANKR. P. 3001(f); *In re Be–Mac Transport Co., Inc.,* 83 F.3d 1020, 1025 (8th Cir.1996); *In re Brown,* 82 F.3d 801, 805 (8th Cir.1996); *In re Gran,* 964 F.2d 822, 826 (8th Cir.1992); *In re Waterman,* 248 B.R. 567, 571 (8th Cir. BAP 2000); *In re Consumers Realty & Dev. Co., Inc.,* 238 B.R. 418, 422 (8th Cir. BAP 1999). To like end, the FCC's claim was fixed and liquidated by a final determination in an administrative proceeding. On the issue of that claim's amount, the Debtors are bound both by *res judicata* and by the *prima facie* effect of the FCC's proof of claim.

 The Debtors do not dispute that these three claims are noncontingent; indeed, it is hard to envision some sort of necessary but as-yet embryonic condition, act, or event precedent, without which the Debtors are not presently liable.[19] This group of noncontingent claims alone, then, liquidates at an aggregate that is greater than the statutory maximum under § 101(51C). The Debtors had the underlying debts, with all of their characteristics, when they filed for Chapter 11. The conclusion is inescapable: the Debtors were not eligible for treatment of their cases under §§ 101(51C) and 1121(e).

 The lack of eligibility alone would furnish the basis for abrogating the Debtors' small-business status. The posture of this case, a year into it, gives an equally strong ground.

For various reasons, these cases simply did not rocket along the fast track. The claims of QAI and Pathfinder were large, and arose from an involved contractual division of business revenues; they were based on a huge number of individual component transactions. The Debtors denied those claims, and insisted that QAI and Pathfinder were liable to them under the same transactions. The parties' dispute ultimately pitched the Debtors into Chapter 11, but attaining the threshold shelter of bankruptcy could not resolve it. Only long litigation, discovery-intensive, could do so.

With a great and baleful complex of issues looming over them, and operating in a complex regulated industry, these Debtors were anything but the localized "Mom and Pop" business concerns for which the fast track was designed. The nature of their troubles made a routine and uncontested disclosure statement process quite unlikely. So did the highly personalized antagonism of their major creditors, potential competitors in a rapidly-changing and hyper-competitive industry. It is utterly no wonder that the Debtors repeatedly hit jarring stops, and could not push a plan to the plate by the statutory deadline. The fit between these cases and the fast track just was not there. Their history shows this quite painfully.

---

**19.** The fact that the QAI and Pathfinder claims are still in litigation, and subject to counterclaim by the Debtors, may prevent them from being "fixed." It does not make them "contingent." The claims are based on past and completed events, in the parties' performance under the IMAs. The parties dispute who owes whom, and, how much, as a result of past events, but the sorting-through of their contentions will result only in the *fixing* of a liability, a contractual duty to pay, that accrued as of the dates of the underlying events. In bankruptcy, a contingent claim is one that has not yet accrued; the debtor's duty to pay is dependent on some *future* event, within the actual or presumed contemplation of the parties, that may never happen. *U.S. v. Union Scrap Iron & Metal,* 123 B.R. 831, 836 (D.Minn.1990); *In re Barcal,* 213 B.R. at 1013; *In re Lull Corp.,* 162 B.R. 234, 239 (Bankr.D.Minn.1993).

■ A debtor's failure to timely use the fast track as it is structured is an appropriate ground for abrogating its status as a small business. If a debtor does not exploit the track's benefits, or merely proves to be incapable of doing so, it should not be allowed to command the lock on reorganization remedies that § 1121(e)(2) creates by the mere lapse of time. Detracking would serve the underlying purpose of the fast track's remedies, as well as Chapter 11's more general goal of preserving value under the protection of a centralized forum.

Under either theory, then, QAI has proved up the basis for abrogating the Debtors' status as small businesses.

### D. May Equity Furnish an Override in Debtor's Favor?

With as strong a basis in law as this, there is no room for a consideration of "equity" to override the driven result. The Debtors must be taken off the fast track but left in Chapter 11. In that status, they no longer have primacy in the Court's considerations, if ever they had it. *Cf. In re Aspen Limousine Serv., Inc.,* 187 B.R. at 994 (opining that small business fast track "is intended to benefit, principally, but not exclusively, the ... debtor").

### IV. DEBTORS' MOTION FOR DISMISSAL

■ The Debtors now recognize that Chapter 11 does not have the utility for them that they had expected, on the small-business track or not. Thus, they want out, via dismissal; they say they will take their chances with the state court's processes in their lawsuit against QAI and Pathfinder. To defuse accusations of bad faith or abusive manipulation, they offer to have the dismissal conditioned on their payment of those other debts for which they acknowledge liability. This would include the FCC's large administrative pen-

alty claim. It would not include QAI and Pathfinder. The Debtors propose to include this mandate to pay and related conditions in the order of dismissal. Presumably, these terms would be backed by the enforcement power of the federal courts. However, the Debtors' duty of performance, i.e., payment in full, would not ripen for months after the dismissal was effective.

There are at least two reasons why the proposal cannot be adopted, and such relief should not be granted.

The first goes to the proposed creation of duties under court order that would not be effective until after this Court relinquished jurisdiction. The cases would be dismissed immediately upon the entry of the order. The Debtors then would "immediately pay" the favored unsecured creditors a partial *pro rata* distribution from a fund of $500,000.00, and would execute promissory notes and confessions of judgment for the balances. The order is silent as to the identity of the forum in which these covenants are to be enforced *in personam,* were the Debtors not to take all of the actions so directed. This Court, however, would be remiss in hearing a request for specific performance; with almost no exceptions, dismissal of a bankruptcy case is a relinquishment of all jurisdiction under 28 U.S.C. § 1334. On the other hand, it is unclear whether a state court would undertake to enforce these covenants either, sited as they are in the order of a specialized federal court. With such loose ends dangling, it just would not be responsible for a court to relinquish jurisdiction.

More crucially, the proposal is fundamentally inconsistent with the requirements and protections of the bankruptcy process.

The inconformity starts with the substantive provisions that essentially set up three classes of claims, one impaired and two not. The proposal for all unsecured creditors other than QAI and Pathfinder frames a class of creditors, and specifies a treatment for their claims. In the sense of bankruptcy law, these creditors' claims would be impaired; the terms of the promissory notes would alter their pre-petition right to compel an immediate in-hand realization.[20] On the other hand, the Debtors' proposal is silent as to QAI and Pathfinder. The implication is that their rights and claims, and the Debtors' counterclaims against them, would be unaffected by the sojourn in bankruptcy. The state court litigation would be the vehicle for reconciling all of these matters. There is no apparent impairment here, within the meaning of § 1124. To like effect, *sub silentio,* Daniel Coleman would retain his equity interest, whole and unimpaired, making up a third ostensible claim of claims.

There would be no discharge of the Debtors, as such. However, the clear implication is that, by force of the order of dismissal, unsecured creditors would have to accept the promissory notes, and be bound by their terms. Ultimately, they could not demand payment of their balances from the Debtors until March 1, 2002.

Finally, the Debtors would fund the first distribution with the proceeds from a secured loan, the named maker of which would receive a primed lien against all of the Debtor's assets. Including such precise terms in a court order has the strong semblance of an authorized secured borrowing under 11 U.S.C. § 364(d), and the foundation for a defense to any future challenge to the lien or the liability.

The further into its details one goes, the more this looks like a plan of reorganization, or at least a large chunk of one. There is even an effluvium of confirmation, of judicial approbation, via the conditions' inclusion in a final order in these cases. The Debtors would not have gone through a confirmation process, but after the entry of this order they could make a colorable claim to much of what a confirmed plan could give them.

There is no significant evidence of mendacity or chicanery here; one need not accuse the Debtors of trying to manipulate the process via this offer. Nonetheless, the proposal simply cannot be brooked. It is damning enough that the urged result would get the Debtors a defined complex of legal benefits from a bankruptcy court when they either could not get them under small-business status, or could now get them only after several stages of success in complex legal proceedings.

Bankruptcy's established way to get a court-sanctioned comprehensive restructuring of debtor-creditor relationships cannot be shortcut in this way. The Debtors' motion must be denied.

## V. U.S. TRUSTEE'S MOTION FOR DISMISSAL

 Once these cases reached their impasse, the U.S. Trustee filed her motion

---

20. The concept of impairment of claims in a Chapter 11 case is created by 11 U.S.C. § 1124. By negative implication from the statute's language, *any* alteration of the pre-petition legal or equitable rights of a creditor, positive or negative, is an impairment. *In re U.S. Truck Co., Inc.,* 47 B.R. 932, 940 n. 23 (E.D.Mich.1985), *aff'd,* 800 F.2d 581 (6th Cir. 1986) ("... a creditor is unimpaired only if the plan restores the creditor to its pre-petition position ..."); *In re Electronics & Metals Industs., Inc.,* 153 B.R. 36, 38 (Bankr. W.D.Tex.1992); *In re Valley Park Group, Inc.,* 96 B.R. 16, 22 (Bankr.N.D.N.Y.1989). *See also, In re Madison Hotel Assoc.,* 749 F.2d 410, 418 (7th Cir.1984).

for conversion.[21] In rather general terms, her counsel opines that a neutral fiduciary would be best-put to evaluate the Debtors' assets, operate the business in the interim, and then liquidate—given the private parties' current pitched contentions over control and value.

 The suggestion is not without attractiveness, given the low level of *ad hominem* accusation to which arguments have sunk. Nonetheless, the proposal is not very attuned to the highly service-intensive nature of the going concerns here. Nor does it really recognize the great advisability of having someone conversant with a complicated industry to coordinate a web of independent performers that are handling a raft of dispersed functions. The Debtors and their opponents both maintain that any interruption in the operational connections would result in service outage, customer defection, and a severe drop in overall value. This could happen even during active oversight by a trustee not versed in the industry. It would be as sure as sunrise, were a trustee to decline an operating administration. Bankruptcy's policy goal of preserving value has special sensitivity in the case of any service business, and so it is here.

However, it is not appropriate to deny the U.S. Trustee's motion out of hand. Abrogating the Debtors' small business status and denying their motion for dismissal will allow QAI to pursue its bid for confirmation. With that on the way, the Debtors may reconsider their withdrawal

from the field of active reorganization, or they may not. At this point, however, QAI's proposal is the only option premised on a going concern, with all that portends by way of maximized value.[22] QAI may have what it takes to win over the Debtors' creditors, and to meet the legal requirements for confirmation; it may not. In any case, it should be given the chance. If QAI is no more successful in commanding Chapter 11 remedies than the Debtors were, there will be proof of a sort that the value just was not there. In that case, a pending request for conversion would provide the apparatus to put these cases to bed. The U.S. Trustee's motion would provide that. Hence, it will not be decided at this time.

### ORDER

On the foregoing memorialization of decision,

IT IS HEREBY ORDERED:

1. The Debtors' status as small businesses within the meaning of 11 U.S.C. § 101(51C) is abrogated; these cases shall no longer be subject to the governance of 11 U.S.C. §§ 1121(e) and 1125(f).

2. The Court will convene a hearing on the pending objections to the adequacy of the disclosure statement filed by QAI, Inc., the date and time of which will be set by separate order.

3. The Debtors' motion for dismissal is denied.

---

**21.** Pursuant to Loc. R. Bankr. P. (D.Minn.) 1017–2(a), the U.S. Trustee's motion was deemed one for conversion *or* dismissal, regardless of which form of relief the movant actually sought, and it was formally styled as such. Her preference is quite clear from the motion papers, however.

**22.** The realization to unsecured creditors under QAI's original "pot plan" was not directly dependent on going-concern status. However, its counsel has promised that a bidding mechanism would be added to its plan to meet the U.S. Trustee's objection. Such a measure would virtually compel a continuation of going-concern operations, to ensure attractiveness to third parties. In consort, the two circumstances bode to give creditors a significant upside from confirmation.

4. The U.S. Trustee's motion for conversion or dismissal shall be held in abeyance, pending further order of the Court.